# Exhibit A

1          UNITED STATES DISTRICT COURT

2           EASTERN DISTRICT OF TEXAS

3              MARSHALL DIVISION

4

5    _____
                                    )
6    CELLULAR COMMUNICATIONS        )
     EQUIPMENT LLC,                 )
7                                   )   Civil Action
              Plaintiff,            )
8                                   )   No. 2:20-cv-00078-JRG
     vs.                            )
9                                   )
     HMD GLOBAL OY,                 )
10                                  )
              Defendant.            )
11   _____)

12

13

14

15         DEPOSITION OF ANTHONY DeROSA

16            (Via videoconference)

17             December 18, 2020

18

19

20

21

22

23

24   Reported by:  John L. Harmonson, RPR

25   Job No. 187848

 1

 2

 3

 4

 5                              December 18, 2020

 6                              9:00 a.m.

 7

 8

 9        Deposition of ANTHONY DeROSA, taken via

10   videoconference with the witness and all parties

11   appearing remotely, pursuant to the Federal Rules

12   of Civil Procedure, by Notice, subject to such

13   stipulations as may be recited herein or attached

14   hereto, before John L. Harmonson, a Registered

15   Professional Reporter and Notary Public of the

16   State of Maryland, who officiated in

17   administering the oath to the witness.

18

19

20

21

22

23

24

25

```
 1                A P P E A R A N C E S

 2

 3   On behalf of the Plaintiff:

 4        BRAGALONE CONROY

 5        2200 Ross Avenue

 6        Dallas, TX 75201

 7      (Via videoconference)

 8

 9        BY:  JERRY TICE II, ESQ.

10             HUNTER PALMER, ESQ.

11

12   On behalf of the Defendant:

13        WARREN LEX

14        2261 Market Street

15        San Francisco, CA 94114

16        (Via videoconference)

17        BY:  MATTHEW WARREN, ESQ.

18

19   ALSO PRESENT (via videoconference):

20        DONALD BREUWET, Legal Video Specialist

21

22

23

24

25
```

1                    EXAMINATION INDEX

2    WITNESS                                    PAGE

3    ANTHONY DeROSA

4      Examination by Mr. Warren                  7

5      Examination by Mr. Tice                    79

6      Examination by Mr. Warren                  86

7                         * * *

8

9                      EXHIBIT INDEX

10   EXHIBIT NO.                                PAGE

11   Exhibit 1   U.S. Patent 7,218,923          11

12   Exhibit 2   Declaration of Anthony DeRosa   13

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                      A. DeROSA

 2   ---------------------------------------------

 3                 P R O C E E D I N G S

 4                     9:00 a.m.

 5   ---------------------------------------------

 6          THE VIDEOGRAPHER:  Good morning.  This

 7       is the start of Media Number 1 for the video

 8       deposition of Anthony DeRosa, in the matter

 9       of Cellular Communications Equipment LLC v.

10       HMD Global Oy, in the United States District

11       Court for the Eastern District of Texas,

12       Marshall Division, Case Number

13       2:20-cv-00078.

14          Today's date is December 18, 2020.

15       The current time is 9:01.  This deposition

16       is being held remotely.

17          My name is Donald Breuwet.  I'm the

18       videographer in association with TSG

19       Reporting.

20          Due to the severity of COVID-19 and

21       following the practices of social

22       distancing, I will not be in the same room

23       with the witness.  Instead, I will record

24       his videotaped deposition remotely.

25          The reporter, John Harmonson, also
```

```
 1                      A. DeROSA

 2        will not be in the same room and will swear

 3        in the witness remotely.

 4             Do all parties stipulate to the

 5        validity of this video recording and the

 6        remote swearing and that it will be

 7        admissible in the courtroom as if it had

 8        been taken following Rule 30 of the Federal

 9        Rules of Civil Procedure and the state's

10        rules where this case is pending?

11             THE WITNESS:  Yes.

12             MR. WARREN:  This is Matt Warren.  I

13        also stipulate.

14             MR. TICE:  So stipulated.

15             THE VIDEOGRAPHER:  Counsel, please

16        introduce yourselves and state whom you

17        represent.

18             (Whereupon, counsel placed their

19        appearances on the video record.)

20                      * * *

21   Whereupon:

22                   ANTHONY DeROSA,

23   after having been first duly sworn or affirmed,

24   was examined and did testify under oath as

25   follows:
```

```
 1                      A. DeROSA
 2   8; is that correct?
 3        A.    That's correct.
 4        Q.    Okay.  All right.  How many hours did
 5   it take to prepare your opinions in Exhibit 2?
 6        A.    I couldn't tell you the exact number
 7   of hours, but it was on the order of four or
 8   five.
 9        Q.    Four or five hours.  That includes
10   review of the patent?
11        A.    Yes.
12        Q.    And how many hours did you spend to
13   prepare for this deposition?
14        A.    I spent most of yesterday.
15        Q.    Eight hours?
16        A.    Yes.
17        Q.    More than eight hours?
18        A.    No, it was exactly eight hours.  I'm
19   used to -- yes.
20        Q.    I'm sorry.  I didn't mean to interrupt
21   you.  Go ahead.
22        A.    Keeping time is a very important
23   aspect of my job as a consultant, and so I keep
24   very accurate records of how long I spend, and I
25   actually spent exactly eight hours yesterday.
```

Page 37

```
 1                     A. DeROSA

 2               Other than time spent preparing for

 3   your -- withdraw that.

 4               Other than time spent preparing your

 5   declaration and time spent preparing for this

 6   deposition, you haven't done any billable work

 7   for this matter; is that correct?

 8        A.    That is correct.

 9        Q.    And the only non-billable work that

10   you've done related to this matter is just

11   reading a book about how to be a witness and

12   isn't directly related to the substance of this

13   matter; correct?

14        A.    Correct.

15        Q.    Okay.  Did you write your declaration?

16               MR. TICE:  Objection; form.

17               THE WITNESS:  Excuse me?

18   BY MR. WARREN:

19        Q.    Did you write your declaration?

20               MR. TICE:  Same objection.

21               THE WITNESS:  The opinions in the

22        declaration are mine.

23   BY MR. WARREN:

24        Q.    I understand that.  I didn't ask that

25   question.
```

```
 1                     A. DeROSA

 2        Q.    So let me stop you.  I asked a bad

 3   question.  It's my fault and I apologize.

 4                   Who in terms of human beings have you

 5   had conversations that include any substance

 6   regarding this engagement?

 7        A.    Just counsel.  Just my counsel.

 8        Q.    What are their names?

 9        A.    Jerry Tice, Hunter Palmer, and Jeff

10   Bragalone.

11        Q.    So aside from Mr. Tice, Mr. Palmer,

12   and Mr. Bragalone, have you had any substantive

13   conversations with anybody about your engagement

14   in this matter?

15        A.    No.

16        Q.    Except for me, of course.

17              When did you speak to Mr. Bragalone?

18        A.    Yesterday.

19        Q.    For how long?

20        A.    A few hours.  We were on a Zoom call.

21              MR. WARREN:  Okay.  All right.  Let's

22        take a ten-minute break.

23              THE WITNESS:  Sounds good.

24              MR. WARREN:  So we will come back

25        at -- I can't even tell what time it is.  We
```

```
 1                    A. DeROSA

 2         will come back at five past the hour if

 3         that's okay with you.

 4                THE WITNESS:  Sounds good.

 5                MR. WARREN:  Thank you very much.

 6                THE VIDEOGRAPHER:  The time is 9:55.

 7         We are off the record.

 8                (Recess taken.)

 9                THE VIDEOGRAPHER:  The time is 10:08.

10         We are on the record.

11   BY MR. WARREN:

12         Q.    Mr. DeRosa, welcome back.

13               Can you turn, please, to Paragraph 14

14   of your declaration.

15         A.    Yes.

16         Q.    And in Paragraph 14 you state, quote:

17   "In my opinion, a person of ordinary skill in the

18   art of the subject matter of the '923 patent

19   would have been a person having the equivalent of

20   an undergraduate degree in computer science (or

21   similar field) and approximately one year of work

22   experience in the field of wireless

23   communications.  Additional education in the

24   field could substitute for industry experience

25   and vice versa."
```

```
 1                    A. DeROSA

 2            Did I read that correctly?

 3       A.    Yes.

 4       Q.    And that was your opinion at the time

 5   of this declaration about the level of ordinary

 6   skill in the art of the subject matter of the

 7   '923 patent; correct?

 8       A.    Yes.

 9       Q.    And that remains your opinion today;

10   correct?

11       A.    Yes.

12       Q.    How did you come to that opinion?

13       A.    This kind of standard was suggested to

14   me by counsel as it has been used in the past.

15   And after, you know, considering the terms and

16   the subject, the contents of the patent, I agreed

17   that that seemed like a reasonable bar.

18       Q.    Where was it used in the past?

19       A.    I couldn't tell you offhand.

20       Q.    Did you review any documents where

21   this standard was used in the past?

22       A.    Not in forming this opinion, no.

23       Q.    That's not what I asked.

24            Did you review any documents where

25   this standard was used in the past?
```

1              A. DeROSA

2              MR. TICE:  Objection; form.

3              THE WITNESS:  I believe I came across

4        something yesterday in an IPR.  I

5        couldn't -- I don't remember which one or

6        how it was used, but I do remember seeing

7        that, something similar.  I don't think it

8        was exactly the same exact standard, but it

9        was very similar, an undergraduate degree

10       with one or two years of experience,

11       something like that.

12   BY MR. WARREN:

13       Q.   What is the process by which one

14   determines the level of ordinary skill in the art

15   for a particular patent?

16       A.   What I did was consider what is the

17   subject matter, what are the topics in here, what

18   are the concepts involved, and what would you

19   kind of need to understand and make sense and

20   have a good understanding of what was claimed in

21   the patent.

22       Q.   Are you aware of the legal standard

23   for determining the level of ordinary skill in

24   the art for a particular patent?

25       A.   No.

Page 56

1                           A. DeROSA

2          Q.    So you formed this opinion regarding

3     the level of ordinary skill in the art by taking

4     a suggestion given to you by counsel and

5     evaluating it as to whether someone who met that

6     standard could reasonably understand the '923

7     patent; correct?

8          A.    I took the suggestion, the suggested

9     standard, and I evaluated it based on what I

10    found in the patent, yes.

11         Q.    Okay.  So that wasn't quite what I

12    asked.  I thought I heard you say -- and correct

13    me if I'm wrong.  I thought I heard you say that

14    in evaluating the standard that counsel suggested

15    to you, you considered whether or not a person

16    who met that standard of a person having ordinary

17    skill in the art could understand the '923

18    patent.  Did I hear that correctly?

19               MR. TICE:  Object to the form.

20               THE WITNESS:  Specifically, in

21        thinking in terms of that term, that

22        "message of the messages."

23    BY MR. WARREN:

24         Q.    So your opinion about the level of

25    ordinary skill is based only on a message of the

```
 1                    A. DeROSA

 2   messages and not on the whole patent?

 3               MR. TICE:  Objection; form.

 4               THE WITNESS:  No, I don't think that's

 5        accurate.

 6   BY MR. WARREN:

 7        Q.    Okay.  Because it says, quote:  "In my

 8   opinion, a person of ordinary skill in the art of

 9   the subject matter of the '923 patent would have

10   been a person," dot, dot, dot, the stuff that I

11   already read.

12               Do you see that?

13        A.    Yes.

14        Q.    So to me, this opinion is not cabined

15   to a particular term.  Do you agree with that?

16        A.    Yes.

17        Q.    This opinion relates to a person

18   having ordinary skill in the art of the subject

19   matter of the '923 patent; correct?

20        A.    Yes.

21        Q.    So what I'm trying to understand is I

22   understand that counsel suggested this language

23   to you.  But you then said you evaluated it in

24   some way.  And I want to make sure I understand

25   the way that you evaluated this language to reach
```

```
 1                      A. DeROSA

 2   your opinion.

 3                Do you understand the question that

 4   I'm asking?

 5        A.    Yes.

 6        Q.    Okay.  So how did you evaluate the

 7   language that counsel suggested in order to reach

 8   your opinion that Paragraph 14 accurately

 9   describes a person of ordinary skill in the art

10   of the subject matter of the '923 patent?

11        A.    There wasn't a formal evaluation

12   process.  It's more of a -- based on my

13   experience, based on what I knew when I was, you

14   know, had an undergraduate degree and one year of

15   experience and people that I know in those

16   similar circumstances, would they be able to

17   understand this patent.  And it seems reasonable

18   that they would be able to.

19        Q.    And so your view is that a person of

20   ordinary skill can understand the -- withdraw

21   that.

22                Your view is that a person of ordinary

23   skill in the art of the subject matter of the

24   '923 patent can understand the '923 patent;

25   correct?
```

Page 59

```
 1                      A. DeROSA
 2       A.    Yes.
 3       Q.    And you are such a person; correct?
 4       A.    Yes.
 5       Q.    Okay.  Let's look at Claim 1.  And
 6  I'll direct you to Column 9 of the patent which
 7  is Exhibit 1.
 8            Tell me when you're ready.
 9       A.    I'm ready.
10       Q.    Claim 1 is a method claim; correct?
11       A.    Yes.
12       Q.    What's the difference between a method
13  claim and an apparatus claim?
14       A.    I don't know.
15       Q.    Okay.  Do you agree with me that to
16  infringe a method claim, a person must have
17  practiced all steps of the claimed method?
18       A.    Can you repeat that question?
19            MR. WARREN:  Mr. Reporter, can you
20       read the question back, please.
21            (The record was read back by the
22       reporter as follows:
23            "Question:  Okay.  Do you agree with
24       me that to infringe a method claim, a person
25       must have practiced all steps of the claimed
```

Page 60

```
 1                      A. DeROSA

 2       method?")

 3               THE WITNESS:  What do you mean by "all

 4       steps"?

 5  BY MR. WARREN:

 6       Q.    What do you mean by all steps?

 7               MR. TICE:  Objection; form.

 8               THE WITNESS:  Where are you referring?

 9  BY MR. WARREN:

10       Q.    I'm not referring to anything.  I'm

11  asking you a question.  Do you agree with me that

12  to infringe a method claim, a person must

13  practice all steps of the claimed method?

14       A.    I'm not sure what you mean by "steps."

15       Q.    Okay.  When you look at the method

16  claim, do you see that it has multiple steps,

17  diverting, controlling, things like that?

18       A.    Yes.

19       Q.    Okay.  And do you agree with me that

20  to infringe a method claim, a person must have

21  practiced all steps of the claimed method?

22       A.    I don't think that's true.

23       Q.    Okay.  How is that not true?

24       A.    I think it has to be one or more of

25  the methods.
```

```
 1                    A. DeROSA

 2        Q.    So I could infringe Claim 1 by

 3   diverting a message of the messages to a

 4   controlling entity residing in the communication

 5   terminal but not, based on the message,

 6   controlling in the controlling entity whether the

 7   application program behaves in a predetermined

 8   manner in a communication terminal?

 9        A.    No, I guess that wouldn't make sense.

10   I imagine you would have to do all of these here.

11        Q.    Okay.  So you do agree with me that to

12   infringe a method claim a person must have

13   practiced all steps of the claimed method?

14        A.    Yes.

15        Q.    Okay.  Let's look at Claim 1.  I want

16   you to assume that a user has a communication

17   terminal.  Let me back up.

18              I'm going to now -- we're going to

19   walk through Claim 1, and I'm going to use terms

20   that appear in the patent.  I mean for those

21   terms to have the meaning that you understand

22   them to have in the patent.

23              Do you understand that?

24        A.    Okay.

25        Q.    So I want you to assume that a user
```

1                     A. DeROSA

2   has a communication terminal.  Do you understand

3   that?

4          A.    Yes.

5          Q.    And I want you to assume that that

6   user uses the communication terminal to send a

7   message from an application towards a

8   communication network.

9          A.    Okay.

10         Q.    Do you understand that?

11         A.    Yes.

12         Q.    Okay.  And the communication terminal

13  then diverts that message to a controlling entity

14  residing in the communication terminal.

15             Do you understand that?

16         A.    I don't believe the user -- I don't

17  believe this claim says the user diverts a

18  message.

19         Q.    I didn't say that.

20             MR. WARREN:  Mr. Reporter, can you

21         read back my question, please.

22             (The record was read back by the

23         reporter as follows:

24             "Question:  Okay.  And the

25         communication terminal then diverts that

```
 1                     A. DeROSA

 2          message to a controlling entity residing in

 3          the communication terminal.

 4               "Do you understand that?")

 5               THE WITNESS:   Sorry.   I misheard.

 6          Yes.

 7     BY MR. WARREN:

 8          Q.    Okay.   And then based on the message,

 9     the controlling entity controls whether the

10     application program behaves in a predetermined

11     manner in a communication terminal, the

12     controlling being performed before the message is

13     transmitted from the communication terminal to

14     the communication network.

15               Do you understand that?

16          A.    Yes.

17          Q.    Does that infringe Claim 1?

18               MR. TICE:   Objection; form.

19               THE WITNESS:   Does what infringe

20          Claim 1?

21     BY MR. WARREN:

22          Q.    The hypothetical that I've just given

23     you.

24          A.    Oh, if you have all of these?

25          Q.    Yes.
```

1                        A. DeROSA

2          A.     Yes, I would -- I guess I would say

3    yes.

4          Q.     Okay.  Now, your construction of

5    this -- or I should say CCE's construction is one

6    or more but less than all of the messages;

7    correct?

8          A.     Yes.

9          Q.     Okay.  So in my hypothetical, there

10   has only been one message.  Do you understand

11   that?

12         A.     Yes.

13         Q.     Okay.  And so your view is that even

14   though a message of the messages is properly

15   construed as one or more but less than all of the

16   messages, the hypothetical that I've given you

17   where a user uses a communication terminal to

18   send one message, that can infringe Claim 1;

19   correct?

20         A.     I'm processing.  Give me a second to

21   just think through the logic here.

22                So my understanding would be yes, if

23   there was a particular use case where an app sent

24   one message and it was diverted, then it would

25   fit the definition of one or more messages being

1                         A. DeROSA

2    sent and would infringe the patent.

3         Q.    So what does "less than all" mean?

4    Because in my hypothetical there is only one

5    message.  So all of the messages are diverted.

6    So what does "less than all" mean in that case?

7         A.    Well, if you're asking me a person of

8    ordinary skill in the art when reviewing this

9    patent, they I believe would understand the term

10   to mean one or more.  And so they would

11   understand that to be infringing the patent.

12        Q.    I apologize.  Let me be clear.  I am

13   now asking you about CCE's construction in this

14   case.  Okay?  We can talk a different time about

15   any other construction, but I am currently asking

16   you about CCE's construction in this case.

17             Do you understand that?

18        A.    Yes.

19        Q.    Under CCE's construction in this case,

20   if a user uses a communication terminal to send

21   one message and the communication terminal

22   diverts that message and then based on that

23   message controls whether the application behaves

24   in a predetermined manner, does that infringe

25   Claim 1?

Page 66

1                       A. DeROSA

2           A.    I guess the thing I'm hesitating on

3    and thinking about is over what period of time.

4    Maybe the app that you've installed has only sent

5    one message, but maybe it will also send another

6    message tomorrow or the day after.  So it would

7    make most sense to interpret what the app is

8    doing over time and not in any one particular

9    instance of time.

10          Q.    Well, I appreciate that you would like

11   to answer a question other than the question that

12   I'm asking.  But I'm asking the question that I'm

13   asking.

14                So the question that I'm asking is:

15   In my hypothetical where a user sends one

16   message, does that infringe Claim 1 under CCE's

17   construction?  Yes, no, or I don't know?

18          A.    I'm only hesitating or saying more

19   because I feel responsible to provide the court

20   with a full understanding of this term and I

21   guess I want to answer your questions in the most

22   helpful way.

23                So I'm just saying I would like you to

24   clarify the question.  Did this app only send one

25   single message ever in the entire span of its

1                          A. DeROSA

2      lifetime?  Or are you saying since the app was

3      installed?  Or to date?

4                  Do you understand what I'm asking?

5          Q.    I understand what you're asking.  I

6      think I've been clear, but let me put it to you

7      this way:  The user sends one message, as we have

8      discussed, and then decides that they hate the

9      communication terminal and throws it in a

10     dumpster fire.  So only one message is ever sent.

11         A.    I guess I would say a person reading

12     this would interpret that as infringing on the

13     patent based on the court's clarification and

14     limitation of the "but not all."  I can see how

15     that would be kind of a special scenario.

16         Q.    So you're answering a lot of questions

17     that I'm not asking.  Okay?  I want you to

18     understand.  Until I tell you otherwise, I'm

19     asking only about CCE's construction.

20                  Do you understand that?

21         A.    Yes.

22         Q.    Okay.  Under CCE's construction, if a

23     user sends one message and one message only,

24     okay, can that user infringe Claim 1?

25                  MR. TICE:  Objection; form.

1                        A. DeROSA

2                 THE WITNESS:  No, I'm not sure that it

3        would.

4    BY MR. WARREN:

5        Q.    We need to get to certainty.  So let

6    me ask the question again.

7                 Under CCE's construction, if a user

8    sends one message and one message only, can that

9    user infringe Claim 1?

10                MR. TICE:  Objection; form.

11                THE WITNESS:  No.

12   BY MR. WARREN:

13       Q.    Okay.  If a user sends two messages

14   and they're both diverted, does that user

15   infringe Claim 1?

16       A.    And when you say a user sent two

17   messages, you're saying those are the only

18   messages the user ever sends with that app?

19       Q.    Correct.

20       A.    Because of the "but less than all"

21   qualifier, then I would have to say no.

22       Q.    So if a user sends two messages and

23   neither of them is diverted, can that user

24   infringe Claim 1?

25       A.    I guess the answer depends on if those

1                        A. DeROSA

2    messages -- if this was a particular case where

3    those messages were not determined to be diverted

4    because of the contents, or if there was never

5    ever any diverting being done.

6         Q.    So I'm not sure I understand what

7    you're saying.  So if a user -- we've established

8    that if a user sends two messages and two

9    messages only and they're both diverted, then

10   under CCE's construction there is no

11   infringement; correct?

12        A.    Correct.

13        Q.    If a user sends two messages and two

14   messages only and neither one of them is

15   diverted, is there infringement?

16        A.    No, because of the "one or more."

17        Q.    Okay.  So if a user sends 6,000

18   messages and they're all diverted, there is no

19   infringement; correct?

20        A.    If a user sends 6,000 and only 6,000

21   and never sends another one, and all of them are

22   diverted, then that would not infringe.

23        Q.    So if a user sends 6,000 messages and

24   none of them are diverted, that also would not

25   infringe; correct?

Page 70

```
 1                        A. DeROSA

 2          A.     Correct.

 3          Q.     If a user sends 6,000 messages and

 4   they're all diverted, so far that user has not

 5   infringed; correct?

 6          A.     Correct.

 7          Q.     If a user then sends message 6,001 and

 8   that message is not diverted, is that message

 9   infringing, or are all 6,001 messages now

10   infringing?

11          A.     In this particular circumstance you're

12   saying the first 6,000 are diverted and then the

13   next one is not?

14          Q.     That is what I'm saying.

15          A.     Then it seems to fit the definition of

16   one or more but not all.

17          Q.     And so does that mean that all 6,001

18   messages that the user sent are now retroactively

19   infringing?

20          A.     Yes.

21          Q.     How can a person of ordinary skill in

22   the art determine at any particular time whether

23   a user is infringing the patent?

24          A.     It would require an analysis of the

25   behavior or a review of the source code or some
```

1                          A. DeROSA

2    other, you know -- I guess those are the only two

3    methods.

4         Q.    Okay.  This is interesting.  So let's

5    take these one at a time.

6              When you say an analysis of the

7    behavior, tell me what you mean.

8         A.    Well, it could be done in a number of

9    ways.  I mean my mother, who is not technical at

10   all, could perform some of that type of behavior

11   analysis and observe what happens based on what

12   the app is -- what kind of messages the app is

13   sending.  Or it could be, on the other end of the

14   spectrum, something much more in-depth; actually

15   reverse engineering the application, for example.

16        Q.    Okay.  So I asked a poor question and

17   I apologize.  Let me ask a better question.

18              In order to determine at any

19   particular time whether a user has infringed

20   Claim 1, I believe you have now said we have to

21   look not only at the user's behavior in the past

22   but also at the user's potential behavior in the

23   future.  Correct?

24        A.    Well, I'm uncomfortable using the word

25   "user," because apps, and specifically malicious

1                       A. DeROSA

2    or fraudulent apps, can act without any input or

3    influence of the user.  So I would want to talk a

4    little bit more about that term.

5        Q.    So I'm -- I'm asking about the same

6    hypothetical that I asked about before where the

7    user sends 6,000 messages.  Okay?  So we'll go

8    back to that hypothetical.

9              In my hypothetical, the user sends

10   6,000 messages and they're all diverted.  You

11   recall this; correct?

12       A.    Yes.

13       Q.    And at the moment the user sends

14   message 6,000, right, it is unknown whether or

15   not messages 1 through 6,000 are infringing

16   because message 6,001 could be not diverted and

17   that, in your opinion, would render messages 1

18   through 6,000 all infringing; correct?

19             MR. TICE:  Objection; form.

20             THE WITNESS:  I guess I would say it's

21        not just the behavior that can cause an

22        infringement.  In fact, it could be that the

23        6,000 could be infringing if you were to

24        review their source code and how it

25        operates.  You would see that even, you

```
 1                    A. DeROSA

 2        know -- even after ten messages, or after

 3        two messages, it would be infringing because

 4        of the logic that's built into the code.

 5   BY MR. WARREN:

 6        Q.    I promise I will get to that.  And I

 7   have stuck a pin in that issue.  But you said

 8   there were two ways to evaluate; one was behavior

 9   and one was source code.  I promise you that we

10   will get to source code, but we're not there yet.

11   I'm still trying to understand how you would

12   evaluate infringement based on behavior.  Okay?

13             So if I understand correctly what

14   you've said before, what I believe you said was

15   that if a user sends 6,000 messages and none of

16   them -- withdraw that.

17             I believe you said before that if a

18   user sends 6,000 messages and they're all

19   diverted, and then the user throws out the

20   device, that user has not infringed.  Correct?

21        A.    You mean the maker of the application

22   didn't infringe?  Is that what you're asking?

23        Q.    I asked the question that I asked.

24        A.    I'm not sure that --

25             MR. TICE:  Object to the form.
```

Page 74

1                          A. DeROSA

2              THE WITNESS:  I'm not sure that users

3         can infringe a patent.  It's the people who

4         make the device that are infringing the

5         patent.

6    BY MR. WARREN:

7         Q.    Okay.  Let me ask the question a

8    different way to avoid this issue.

9              If a user -- we talked previously

10   about how a user can have a communication

11   terminal under the '923 patent; correct?

12        A.    Yes.

13        Q.    Okay.  And I believe we agreed that if

14   the user uses the communication terminal to send

15   messages from an application program towards the

16   communication network and the communication

17   terminal diverts all of those messages to a

18   controlling entity, and the controlling entity

19   then, based on the message, controls whether the

20   application program behaves in a predetermined

21   manner, okay, that no infringement has occurred

22   if they're all diverted.  Correct?

23        A.    Let me think about that for a second.

24              I guess I would say it's not possible

25   to know just based on a given sample of observing

```
 1                     A. DeROSA

 2   what an app does.  So I may want to go back and

 3   revisit what we discussed as I'm thinking about

 4   it a little bit more.

 5        Q.    Well, let's do that.  So in my first

 6   hypothetical, a user uses a communication program

 7   to send a message -- withdraw that.

 8            A user of a communication terminal

 9   sends a message from an application program

10   towards a communication network.  The

11   communication terminal diverts the message to a

12   controlling entity and, based on the message, the

13   controlling entity determines whether the

14   application program behaves in a predetermined

15   manner.

16            Are you with me so far?

17        A.    Yes.

18        Q.    The user has sent one message.  Is it

19   possible that message has been diverted?  Is it

20   possible to determine whether infringement has

21   occurred?

22        A.    No.

23        Q.    Is it ever possible to determine

24   whether infringement has occurred based simply on

25   whether or not a particular message has been
```

1                       A. DeROSA

2    diverted?

3         A.    Maybe with enough analysis.

4         Q.    But it's not always possible; correct?

5         A.    Correct.

6         Q.    What would you have to do to determine

7    whether infringement has occurred in my

8    one-message hypothetical?

9         A.    You would have to understand how the

10   device was operating, and you would have to kind

11   of identify the logic in that communication

12   terminal in order to understand if there was

13   diverting and controlling being done.

14        Q.    Okay.  And so do I correctly

15   understand you to be saying that if a user is

16   using a communication terminal and that user

17   sends a single message from an application

18   program toward a communication network and then

19   the communication terminal diverts that message

20   to a controlling entity, and the controlling

21   entity controls whether an application program

22   behaves in a predetermined manner, in that

23   hypothetical, in order to determine whether

24   infringement occurs you would have to look at

25   whether the device was capable of sometimes

```
 1                      A. DeROSA

 2   diverting and sometimes not diverting.  Am I

 3   understanding that correctly?

 4        A.    Correct.

 5        Q.    Okay.  And so to determine whether a

 6   person has infringed Claim 1, one must consider

 7   not only the steps of the method being performed

 8   but also the source code being used to perform

 9   that method; correct?

10              MR. TICE:  Objection; form.

11              THE WITNESS:  No, you would not need

12        the source code.

13   BY MR. WARREN:

14        Q.    Okay.  So in order to -- withdraw

15   that.

16              To determine whether a person has

17   infringed Claim 1 of the '923 patent, one must

18   consider not only the steps of the method being

19   performed but also the apparatus being used to

20   perform that method; correct?

21        A.    Yes.

22              MR. WARREN:  Okay.  I have no further

23        questions.

24              MR. TICE:  Let's take a quick break.

25              MR. WARREN:  You're going to cross or
```

Page 78

```
 1                    A. DeROSA
 2   you're not going to cross?  We're not going
 3   to take a break.
 4        MR. TICE:  We're going to take a
 5   break, and then we may have questions or we
 6   may not.
 7        MR. WARREN:  Okay.  Well, Jerry, I
 8   want you to confirm you're not going to
 9   speak with the witness during this break.
10        MR. TICE:  Sure, that's fine.
11        MR. WARREN:  Okay.  So, Mr. DeRosa,
12   after this break, I'm going to ask if you
13   had any conversations with your counsel and
14   you are going to answer that question "No."
15   Do you understand me?
16        THE WITNESS:  I will answer
17   truthfully.
18        MR. TICE:  We're going off the record
19   now.
20        MR. WARREN:  But, Jerry, I've got your
21   agreement that you're not going to
22   communicate with him during this break,
23   because otherwise I don't consent to going
24   off the record.
25        MR. TICE:  Yes, I agree.  I don't know
```

1                      A. DeROSA

2       what else you want us to say.  We're going

3       off the record.

4              MR. WARREN:  Okay.  Thank you.  Wait.

5       Ten minutes?

6              Mr. DeRosa, they didn't say, so let's

7       just say ten minutes.

8              THE WITNESS:  Okay.

9              THE VIDEOGRAPHER:  This marks the end

10      of Media Number 1 in the deposition of

11      Anthony DeRosa.  The time is 10:38.  We are

12      off the record.

13             (Recess taken.)

14             THE VIDEOGRAPHER:  This is the start

15      of Media Number 2 in the deposition of

16      Anthony DeRosa.  The time is 10:47.

17             MR. TICE:  Welcome back, Mr. DeRosa.

18      This is Jerry Tice.  I have a few follow-up

19      questions for you regarding your testimony

20      here today.

21                     EXAMINATION

22   BY MR. TICE:

23      Q.   First, I would like to refer you to

24   the '923 patent.  I would like you to take a look

25   at Column 9, Claim 1.  And let me know when you

```
 1                     A. DeROSA

 2   get there.

 3         A.    I have it here.

 4         Q.    Do you see in Claim 1, right beside

 5   the 1 there is a portion of text that says:  "A

 6   method for controlling application programs in a

 7   communication terminal, the method comprising..."

 8              Do you see that?

 9   A.    Yes.

10              MR. WARREN:  Objection to the form.

11              Sorry.  Mr. DeRosa, you've got to wait

12         for a second to let me get the objections

13         out.

14              Object to the form.

15   BY MR. TICE:

16         Q.    Under this portion, there are one,

17   two -- three different paragraphs, all separated

18   by a semicolon.  Do you see that?

19         A.    I do.

20              MR. WARREN:  Objection to form.

21   BY MR. TICE:

22         Q.    In the first paragraph --

23              MR. WARREN:  I'm sorry.  Did the

24         witness answer?  I didn't hear him answer.

25              MR. TICE:  Sorry, Matt.  He said "I
```

```
1                       A. DeROSA

2        do."

3              Mr. Reporter, could you please read

4        back the last answer.

5              (The record was read back by the

6        reporter as follows:

7              "Question:  Do you see that?

8              "Answer:  I do.")

9              MR. WARREN:  And, John, you got my

10       objection in there too; right?

11             THE REPORTER:  Yes, I did.

12             MR. WARREN:  Mr. DeRosa, you've got to

13       slow down a little bit because I do want to

14       get the objections out, and we do want a

15       clean transcript.

16             Sorry, Jerry.  I interrupted you.

17   BY MR. TICE:

18       Q.    Mr. DeRosa, just pause for a second

19   after a question so Mr. Warren can object if he

20   would so like to.

21             So going back to the questioning,

22   Mr. DeRosa, this first paragraph, it begins with

23   the word "sending."  Do you see that?

24             MR. WARREN:  Object to the form.

25             THE WITNESS:  Yes.
```

Page 82

```
 1                    A. DeROSA
 2   BY MR. TICE:
 3       Q.    And the second paragraph under Claim 1
 4   begins with the word "diverting."  Do you see
 5   that?
 6            MR. WARREN:  Object to the form.
 7            THE WITNESS:  I do.
 8   BY MR. TICE:
 9       Q.    And then looking at the third
10   paragraph, it says "based on the message
11   controlling."  Do you see that language?
12            MR. WARREN:  Object to the form.
13            THE WITNESS:  Yes.
14   BY MR. TICE:
15       Q.    Do you understand that each of these
16   paragraphs are limitations of Claim 1?
17            MR. WARREN:  Object to the form.
18            THE WITNESS:  I do understand that.
19   BY MR. TICE:
20       Q.    And to practice the claim, the claimed
21   method, all of these limitations -- or I believe
22   Mr. Warren previously referred to them as
23   steps -- they need to be practiced; correct?
24            MR. WARREN:  Object to the form.
25            THE WITNESS:  That was my
```

Page 83

1                        A. DeROSA

2        understanding.

3   BY MR. TICE:

4        Q.    I would like you to look at this --

5   the first limitation that says "sending

6   messages."  Do you see that?

7             MR. WARREN:  Object to the form.

8             THE WITNESS:  Yes.

9   BY MR. TICE:

10       Q.    And this requirement of sending

11  messages, is it met if only one message is sent?

12            MR. WARREN:  Object to the form.

13            THE WITNESS:  No.  It's plural.

14  BY MR. TICE:

15       Q.    I would like you to take a look at the

16  diverting step.  Therein it says "a message of

17  the messages."  Do you see that?

18       A.    I do.

19            MR. WARREN:  Object to the form.

20       Object to the form.

21  BY MR. TICE:

22       Q.    And you would agree that the sending

23  step is different than the diverting step;

24  correct?

25            MR. WARREN:  Object to the form.

```
 1                    A. DeROSA

 2              THE WITNESS:  I would, yes.

 3   BY MR. TICE:

 4       Q.    And in the diverting step, it includes

 5   the phrase of your opinion, "a message of the

 6   messages"; right?

 7              MR. WARREN:  Object to the form.

 8              THE WITNESS:  Can you repeat the

 9       question?

10   BY MR. TICE:

11       Q.    I'm referring to this language right

12   after "diverting."  It says "a message of the

13   messages."

14              And my question is:  This language, "a

15   message of the messages," that is the claim terms

16   that you analyzed in your opinion; correct?

17              MR. WARREN:  Object to the form.

18              THE WITNESS:  Yes.

19   BY MR. TICE:

20       Q.    Now, earlier you testified that the

21   sending step requires sending multiple messages

22   because of the plural use of the word "message";

23   correct?

24              MR. WARREN:  Object to the form.

25              THE WITNESS:  Yes.  I guess I can see
```

1                    A. DeROSA

2         that I made a mistake.  I guess I would say

3         when Matthew previously asked me if it just

4         fit -- if an application had existed that

5         only sends one message would fit, that

6         doesn't actually meet this first step where

7         it does require sending messages.

8    BY MR. TICE:

9         Q.   Okay.  Thank you for that

10   clarification.

11            I would like to discuss now the

12   "diverting a message of the messages" phrase of

13   Claim 1.  Do you see that?

14        A.   I do.

15            MR. WARREN:  Object to the form.

16   BY MR. TICE:

17        Q.   Could the claim be practiced if one

18   message is diverted?

19            MR. WARREN:  Object to the form.

20            THE WITNESS:  Yes.

21   BY MR. TICE:

22        Q.   Mr. DeRosa, have you performed an

23   infringement analysis for any devices or products

24   related to the '923 patent?

25        A.   No.

```
 1                     A. DeROSA

 2              MR. WARREN:  Object to the form.

 3    BY MR. TICE:

 4         Q.    And do you offer any opinions of

 5    whether any devices infringe the '923 patent?

 6              MR. WARREN:  Object to the form.

 7              THE WITNESS:  That was not in my scope

 8         of work here.

 9              MR. TICE:  Thank you, Mr. DeRosa.

10              I pass the witness.

11                     EXAMINATION

12    BY MR. WARREN:

13         Q.    Mr. DeRosa, since I last asked you

14    questions, have you communicated with anybody

15    else?

16         A.    No.

17         Q.    Do you want to change any of the

18    answers that you gave during my examination?

19         A.    I do.  I believe I was mistaken, and I

20    want to make sure that I'm not misrepresented in

21    my testimony here.  So, you know, when I was here

22    answering your questions, I should have read more

23    carefully before answering some of them, and I

24    might want to change what I said.

25         Q.    What do you want to change?
```

```
 1                    A. DeROSA

 2        A.    Well, it would appear that the

 3   fictitious scenario that you presented where an

 4   application exists and it only sends one message

 5   and then the user throws it in the garbage, that

 6   wouldn't even fit in this scenario here because

 7   Claim 1 does say a scenario does require sending

 8   more than one message or -- yeah, sending one or

 9   more messages.

10        Q.    I also asked you about two messages;

11   correct?

12        A.    I do remember a fictitious scenario

13   where an app sends two messages.

14        Q.    And your answer with regard to that

15   doesn't change; correct?

16        A.    Can someone tell me what I said?  I

17   don't know if the court reporter can.  I would

18   like to think about it again.

19        Q.    So you don't recall your answer from

20   45 minutes ago?

21             MR. TICE:  Objection; form.

22             THE WITNESS:  I guess what I don't

23        recall is the specific wording.  In the

24        specific wording, I might have glossed over

25        some aspect of the question.
```

```
 1                   A. DeROSA

 2   BY MR. WARREN:

 3        Q.    Okay.  Do you recall discussing 6,000

 4   messages?

 5        A.    I do.

 6        Q.    Do any of your answers change with

 7   regard to 6,000 messages?

 8        A.    I believe the question was if an app

 9   sends 6,000 messages and none of them are

10   diverted, and then another message is sent that

11   is diverted, does that infringe the patent.  I

12   guess I might want to preface all of this with I

13   was narrowly looking at what it means for the

14   "message of the messages" and what that means.

15             I wasn't -- I wasn't conjuring up

16   fictitious examples and trying to think through

17   and examine whether they may or may not infringe.

18   That was beyond what I was asked to do.

19        Q.    Mr. DeRosa, your testimony previously

20   to me was under oath; correct?

21        A.    Yes.

22        Q.    And you take that seriously; correct?

23        A.    I do.

24        Q.    And you answered those questions

25   truthfully and to the best of your ability;
```

```
 1                    A. DeROSA
 2   correct?
 3        A.    Yes.
 4        Q.    And you told me that you were a person
 5   of ordinary skill in the art; correct?
 6        A.    Yes.
 7        Q.    And you defined a person of ordinary
 8   skill in the art as someone who could understand
 9   the '923 patent; correct?
10        A.    Yes.
11        Q.    So when you gave the answers that you
12   gave to me previously, you were giving me those
13   answers as a person of ordinary skill in the art
14   who can, by your own definition, understand the
15   '923 patent; correct?
16        A.    Yes.
17        Q.    Okay.  Other than with regard to the
18   hypothetical situation where only one message is
19   sent over the lifetime of the device, do you want
20   to change any of the answers that you gave me
21   under oath previously?
22        A.    Towards the end of our discussion we
23   were getting at a question of can you determine
24   whether or not something infringes and how you
25   might be able to determine that.  And I want to
```

1                        A. DeROSA

2    make sure that I'm representing my opinion

3    truthfully and honestly and clearly -- emphasis

4    on clearly.

5              MR. WARREN:  Mr. Reporter, can you

6         read back the question that I asked, please.

7              MR. TICE:  I'm sorry.  Mr. DeRosa,

8         were you finished?

9              MR. WARREN:  Oh, I thought you were.

10             THE WITNESS:  I guess I would love the

11        chance to just clarify those questions you

12        asked me about the 6,000 messages just to

13        make sure that my words aren't

14        misrepresented.

15   BY MR. WARREN:

16        Q.   What is it that you said incorrectly

17   under oath previously?

18        A.   Well, it's the question of can you

19   tell if something infringes based on observing N

20   number of messages.

21        Q.   What was incorrect about your previous

22   answer under oath?

23             MR. TICE:  Objection; form.

24             THE WITNESS:  I don't know that

25        anything was incorrect.  I would just -- I'm

1                    A. DeROSA

2          thinking back and wondering if -- if I said

3          that you can or cannot determine based on

4          observation or if you need to observe

5          something more internally about the

6          application.

7     BY MR. WARREN:

8          Q.    Do you stand by your previous

9     testimony under oath, or do you withdraw your

10    previous testimony under oath and state that it

11    was incorrect?

12         A.    I stand by it.

13         Q.    And so what is it that you want -- if

14    you stand by your previous testimony under oath,

15    what is it that you want to clarify now?

16         A.    Well, it's an interesting question to

17    ask if you can tell if something infringes based

18    on N number of messages.  I didn't fully think

19    about that -- that particular scenario and that

20    issue.  I think there's some interesting --

21    there's some interesting answers to that

22    question, I guess.

23         Q.    And are there interesting answers to

24    that question that you didn't previously give

25    under oath?

Page 92

```
 1                    A. DeROSA

 2        A.    Well, would it be possible to just

 3   read back the questions where we talked about the

 4   6,000 messages?

 5        Q.    I'm asking you what you said wrong

 6   before.  And what I'm hearing is nothing, but I

 7   want to do it again anyway.  Is that correct?

 8             MR. TICE:  Objection; form.

 9             THE WITNESS:  No, that doesn't seem

10        fair.  I just want to be sure that the

11        record records what I actually believe at

12        this moment during this deposition.

13   BY MR. WARREN:

14        Q.    And what is concerning you about those

15   questions?  That's what I want to understand.

16   Clearly what is concerning you is you think you

17   said something wrong but you don't know what it

18   is.

19             So what is concerning you?

20        A.    The question of whether or not you can

21   tell if a technology -- in this regard to

22   Claim 1 -- the question of whether you can tell

23   based on some number of message whether it

24   infringes or not.

25        Q.    And you previously answered that if a
```

```
 1                      A. DeROSA

 2   user sends 6,000 messages and none of them are

 3   diverted but the patent is otherwise met, that

 4   you cannot tell if those 6,000 messages are

 5   infringing.  Correct?

 6        A.    You would not be able to make a

 7   determination one way or the other, correct.

 8        Q.    And was there anything incorrect about

 9   that testimony?

10        A.    No, I don't think so.  If -- I don't

11   think so.

12        Q.    Okay.  Is there anything you want to

13   clarify about that testimony?

14        A.    Yeah.  I would just say in this

15   example where you have some technology that sends

16   6,000 messages and you for a fact know that none

17   of them were diverted, which that opens -- I

18   mean, an end user like my mother, for example,

19   may not be able to tell whether something was

20   diverted or not.  But let's say that someone knew

21   that they were not diverted.  It's still, I

22   think, unclear whether or not the patent was

23   infringed.  You would need more information.

24        Q.    Okay.  So what I understand you to be

25   saying -- withdraw that.
```

1                         A. DeROSA

2               I'm not asking about your mother's

3    understanding as a potential user of a

4    communication terminal.  I'm asking about your

5    understanding as a person of ordinary skill who

6    can understand the '923 patent.

7               Do you understand that?

8         A.   Okay.  So only think about in terms of

9    what I know.  Yes.

10        Q.   I'm not -- I don't know what that

11   answer is.  You brought your mother into this and

12   you said she might not know as a user.  I want to

13   make sure you understand I'm not asking about

14   what the user knows.  Okay?

15               I'm asking about your understanding of

16   the patent as a person of ordinary skill in the

17   art.  Do you understand that?

18        A.   Yes.

19        Q.   And that was what I was asking about

20   before when we talked about 6,000 messages;

21   correct?

22        A.   Yes.

23        Q.   Okay.  And in that discussion you

24   explained, and have now re-explained, that if a

25   user sends 6,000 messages, all of which is

```
 1                    A. DeROSA

 2   diverted, or none of which is diverted, then you

 3   can't tell at that point whether those 6,000

 4   messages are infringing based on the information

 5   that you have; correct?

 6        A.    Well, the user doesn't infringe and

 7   the message doesn't infringe, but the technology,

 8   the device, the technology of the device is what

 9   may or may not infringe.  And yes, I would agree

10   you cannot tell.

11        Q.    And so the only way to tell whether a

12   user infringes Claim 1 by sending a message on a

13   communication terminal toward a network is by

14   understanding how that communication terminal

15   works, understanding the apparatus that is

16   sending the message; correct?

17              MR. TICE:  Objection; form.

18              THE WITNESS:  I don't know if the word

19         "apparatus" means something technically,

20         legally, in legalese work.  But you would

21         have to understand the inner workings of the

22         device to identify that diversion is being

23         done on one or more of the messages.

24   BY MR. WARREN:

25        Q.    So I'll try to use terms that don't
```

Page 96

```
 1                         A. DeROSA

 2     seem loaded to you.

 3               What matters is not whether or not a

 4     particular message is diverted.  What matters is

 5     whether the communication terminal has the

 6     capability of diverting some but not all of the

 7     messages; correct?

 8               MR. TICE:  Objection; form.

 9               THE WITNESS:  Well, I mean, the claim

10          said "diverting."  So it has to be doing

11          some type of diverting.

12               MR. WARREN:  Mr. Reporter, can you

13          read back my question, please.

14               (The record was read back by the

15          reporter as follows:

16               "Question:  So I'll try to use terms

17          that don't seem loaded to you.

18               "What matters is not whether or not a

19          particular message is diverted.  What

20          matters is whether the communication

21          terminal has the capability of diverting

22          some but not all of the messages; correct?")

23               THE WITNESS:  The only reason I'm

24          hesitating is "has the capability."  I'm

25          thinking of a case where -- not the
```

1                          A. DeROSA

2          technical word case, but I'm thinking of an

3          example where maybe the device manufacturer

4          does ship something with a capability but

5          always has the capability turned off and

6          never makes use of it.  So in that case, I

7          don't think it would be infringing if it

8          wasn't actually ever doing it.

9                  So has the capability and also enables

10         the capability or makes use of that

11         capability.

12   BY MR. WARREN:

13         Q.    So in order -- withdraw that.

14                In order to determine whether a user

15   sending a particular message from a communication

16   terminal infringes Claim 1, you must examine not

17   only whether or not the device has the capability

18   of diverting a message or not diverting a

19   message, but also whether or not that capability

20   is enabled; correct?

21         A.    I mean, I think that's -- yes.

22                MR. WARREN:  I have no further

23         questions.

24                MR. TICE:  Thank you, Mr. DeRosa.  I

25         have no questions.

Page 98

```
 1                    A. DeROSA

 2          The witness will read and sign.

 3          THE WITNESS:  What was that?  The

 4     witness will what?

 5          MR. TICE:  Sorry, Mr. DeRosa.  It's

 6     just a legal formality.  It's not a question

 7     to you.

 8          THE WITNESS:  Okay.

 9          THE VIDEOGRAPHER:  This is the end of

10     Media Number 2 in the deposition of Anthony

11     DeRosa.  This also concludes today's

12     deposition.  The time is 11:08.  We are off

13     the record.

14          (Deposition adjourned at 11:08 a.m.)

15

16

17

18

19

20

21

22

23

24

25
```

1                    A. DeROSA

2              ACKNOWLEDGMENT OF DEPONENT

3

4       I, ANTHONY DeROSA, have read or have had the

5    foregoing testimony read to me and hereby certify

6    that it is a true and correct transcription of my

7    testimony with the exception of any attached

8    corrections or changes.

9

10

11    _____

12    ANTHONY DeROSA

13    [ ] No corrections

14    [ ] Correction sheet(s) enclosed

15

16       SUBSCRIBED AND SWORN TO BEFORE ME, the

17    undersigned authority, by the witness, ANTHONY

18    DeROSA, on this the _____ day of

19    _____, _____.

20

21

22

23

24

25

Page 100

1                    A. DeROSA

2               C E R T I F I C A T E

3

4   STATE OF MARYLAND

5          I, JOHN L. HARMONSON, a Notary Public

6   within and for the State of Maryland, do hereby

7   certify that ANTHONY DeROSA, the witness whose

8   deposition is hereinbefore set forth, was duly

9   sworn by me and that such deposition is a true

10  record of the testimony given by such witness.

11         That before completion of the

12  proceedings, review and signature of the

13  transcript was requested.

14         I further certify that I am not related

15  to any of the parties to this action by blood or

16  marriage; and that I am in no way interested in

17  the outcome of this matter.

18         IN WITNESS WHEREOF, I have hereunto set

19  my hand this 31st day of December, 2020.

20

21  _____

22         JOHN L. HARMONSON, RPR

23         My commission expires: 08/16/21

24

25